**NORRIS et al. v. JONES, Collector of Internal Revenue.**

**NORRIS v. SAME.**

**Nos. 57, 58.**

District Court, W. D. Oklahoma.

Jan. 26, 1940.

D. A. Richardson, of Oklahoma City, Okl. (Hayes, Richardson, Shartel & Gilliland, of Oklahoma City, Okl., on the brief), for plaintiffs.

Carl J. Marold, Sp. Asst. to Atty. Gen., of Washington, D. C. and Charles E. Dierker, U. S. Dist. Atty., of Oklahoma City, Okl., for defendant.

VAUGHT, District Judge.

The facts in this case, to a very great extent, are stipulated by the parties and there is little conflict in the evidence introduced as to the real issues. However, the court is inclined to make a rather full statement in this opinion of the facts and contentions of the parties.

Cause Number 57 is an action by plaintiffs, P. A. Norris and Josephine Norris, for the recovery of $10,958.94 paid by them as a deficiency in federal income taxes for the year 1934 and as interest thereon. Cause Number 58 is an action by P. A. Norris for the recovery of $85,626.78 paid by him as a deficiency in federal income taxes for the year 1935 and as interest thereon. The issues of law and of fact being the same in each case, the causes have been consolidated by order entered upon stipulation of the parties. A jury trial has been waived.

Plaintiffs, P. A. Norris and Josephine Norris, are citizens of the United States and residents of Ada in Pontotoc County, Oklahoma; and during 1934 and 1935 and prior and subsequent thereto they were husband and wife living together as such.

Defendant, H. C. Jones, is now, and since prior to 1934 has been, the duly appointed, qualified and acting collector of internal revenue of the United States for the district of Oklahoma; and he resides in Oklahoma City in said state.

Referring to Cause Number 57, the time for filing plaintiffs' income tax return for the year 1934 having been lawfully extended, on March 23, 1935, plaintiffs filed with defendant their joint tentative return for said year, tentatively showing therein an income tax due in the sum of $300, and at the same time they paid to defendant $75 as one-fourth of said estimated tax; and thereafter, within said extended time, they filed with defendant their final joint individual income tax return, which re-

flected no income tax liability for the year 1934.

On April 12, 1938, the Commissioner of Internal Revenue mailed to plaintiffs a ninety-day letter, stating that the determination of their income tax liability for the year 1934 disclosed a deficiency of $10,592.44; and, after waiver of restrictions on the assessment and collection of said alleged deficiency, and over plaintiffs' protests and objections, the Commissioner assessed against plaintiffs an income tax deficiency for the year 1934 in the sum of $10,592.44, and interest thereon in the sum of $2,019.06, aggregating $12,611.50; and, on June 1, 1938, defendant mailed to plaintiffs notice of said assessment and a demand for payment thereof. Pursuant to said assessment and demand, plaintiffs paid to defendant, on June 4, 1938, the amount of said deficiency assessment and interest aggregating $12,611.50. On June 15, 1938, plaintiffs filed with defendant their claim for the refund of said sum of $75 paid on March 23, 1935, and of the said sum of $12,611.50 paid on June 4, 1938; and on October 31, 1938, the Commissioner of Internal Revenue formally disallowed said claim and sent to plaintiffs by registered mail notice of said disallowance.

Of the adjustments made by the Commissioner in determining the alleged deficiency for the year 1934, the only one the correctness and lawfulness of which is in controversy in Cause Number 57 is the inclusion in plaintiffs' income for said year of the income of seven trusts, which amounted to $35,893.37; and the only question in Cause Number 57 is whether or not said income of said seven trusts was lawfully taxable to plaintiffs. The parties have stipulated that, in the event the court should find that said income of said trusts was not lawfully taxable to plaintiffs, then plaintiffs are entitled to recover in said cause the sum of $10,958.44, and interest thereon at six per cent per annum from June 4, 1938.

Referring to Cause Number 58, within the time provided by law plaintiff P. A. Norris filed with defendant plaintiff's individual income tax return for the year 1935, and therein showed a total tax due of $190.91, which plaintiff duly paid. On April 12, 1938, the Commissioner of Internal Revenue mailed to plaintiff a ninety-day letter, stating that the determination of his income tax liability for the year 1935 disclosed a deficiency of $76,122.76; and, after waiver of restrictions on the assessment and collection of said deficiency, and over plaintiff's protest and objection, the Commissioner assessed against plaintiff an income tax deficiency for the year 1935 in the sum of $76,122.76, and interest thereon in the sum of $10,046.12, aggregating $86,168.88; and, on June 1, 1938, defendant mailed to plaintiff notice of said assessment and a demand for payment thereof. Pursuant to said assessment and demand plaintiff paid to defendant, on June 4, 1938, the amount of said deficiency assessment and interest, aggregating $86,168.88. On June 15, 1938, plaintiff filed with defendant his claim for the refund of said sum of $86,168.88; and on October 31, 1938, the Commissioner formally disallowed said claim and sent to plaintiff by registered mail notice of said disallowance.

Of the adjustments made by the Commissioner in determining the alleged deficiency for the year 1935, the only ones the correctness and lawfulness of which are in controversy in Cause Number 58 are (a) the inclusion in plaintiff's income for the year 1935 of the income for said year of the same seven trusts heretofore mentioned, which income amounted to $166,922.29, and (b) the inclusion in plaintiff's income for said year of the income of two other trusts, which income amounted to $3,901.72; and the question in Cause Number 58 is whether or not the income of said trusts was lawfully taxable to plaintiff. The parties have stipulated that, if the court should find that the income of none of the nine trusts was lawfully taxable to plaintiff, then plaintiff is entitled to recover the sum of $85,626.78 and interest thereon at six per cent per annum from June 4, 1938; that, in the event the court should find that the income of the seven trusts was not lawfully taxable to plaintiff, but that the income of the two trusts was lawfully taxable to plaintiff, then plaintiff is entitled to recover the sum of $85,259.11 and interest thereon at six per cent per annum from June 4, 1938; and that, if the court should find that the income of the two trusts was not lawfully taxable to plaintiff, but that the income of the seven trusts was lawfully taxable to plaintiff, then plaintiff is entitled to recover the sum of $2,424.80 and interest thereon at six per cent per annum from June 4, 1938.

As to the seven trusts, the income of which is involved in both causes:

(a) On January 20, 1921, plaintiff P. A. Norris executed, acknowledged and de-

livered an instrument in writing entitled "Declaration of Trust", in which he appointed The First National Bank of Ada as trustee, and by which he assigned, transferred and delivered to said trustee shares of stock of Magnolia Petroleum Company and of Hollis Cotton Oil Company of the aggregate value of $172,949. He therein declared that said trust estates were created for and intended as irrevocable gifts for the separate use and benefit of seven of his children therein named, in the sum of $24,707 each, and that said trusts should continue and be in force for a period of twenty years from the date of the instrument.

(b) The trust instrument authorized and empowered the trustee to keep the trust property in its possession, to manage and control the same, and to collect the income therefrom; to sell the trust property and to invest and reinvest the proceeds thereof and the income therefrom in well-located business property, in well-improved farm lands, in loans secured by first mortgage liens, or in bonds of municipalities, states or the United States, or, during plaintiff's lifetime, in loans secured by liens approved by plaintiff, all upon such terms and conditions as the trustee should deem for the best interests of the trust estates; and the instrument empowered the trustee to receive title to, hold, buy, sell, exchange, transfer and convey both real and personal property, and generally to do any lawful act in relation to such trust property which any individual owning the same might do.

(c) It was provided that the income from each trust estate should be retained by the trustee and added to and become a part of the corpus of the estate to which it accrued, and should be invested and handled as such until the termination of the trusts, unless otherwise directed by plaintiff as thereinafter provided.

(d) It was provided that the beneficiaries should have no power to revoke or annul the provisions of the trust instrument or to exercise authority over the management or control of the trusts, either before or after plaintiff's death; nor should they assign, convey, anticipate, mortgage, pledge or hypothecate, or in any way create a charge upon their trust estates before the termination of the trusts, nor should the trustee recognize any such assignment, charge or claim, except the right of the beneficiaries to demand and receive their respective estates upon the termination of the trusts; and that all incomes and corpus, when due under the terms of the trust, should be paid to the respective beneficiaries in person.

(e) The instrument provided that, while the trust estates created were separate and distinct estates and were to be so handled, the trustee should have power, when he thought proper, to invest the funds of any two or more of said estates jointly in the same property, but that the income from such joint investment should be apportioned to each of such beneficiaries according to his or her interest therein.

(f) The instrument required the trustee to make annual reports of the condition of each estate, the amount thereof, the kind, character and value of the investments, all disbursements made, and the net income added to the corpus. The trustee was authorized and directed to pay all taxes, costs, expenses, charges and liabilities of the trusts. At the end of twenty years, upon the termination of the trusts, the trustee was required to make full and complete settlement with each beneficiary and to deliver to each in person his or her trust estate, whether the same was then in money, notes, bonds, real estate or other property, and to execute and deliver to the beneficiaries such assignments and conveyances as might be necessary to vest in them the legal title to their respective estates and their accumulations.

(g) The instrument provided that if any beneficiary should die during the trust period, the trust in his or her favor should not be terminated, but should continue for its full term; and, at the end of the trust period the trust estate of such deceased beneficiary should be paid in equal parts to any child or children of his or hers then living, and, if no such child or children should be living, then the trust estate should be paid in equal parts to the surviving beneficiaries and to the children then living of any deceased beneficiary.

(h) In the trust instrument plaintiff reserved to himself the following rights:

(1) The right to approve or disapprove, during plaintiff's lifetime, loans of trust funds proposed to be made by the trustee upon the security of first mortgages or other liens.

(2) The right, while plaintiff should live and continue mentally and physically capable of transacting his ordinary business, to designate the investments which should be made of the trust funds.

(3) The right to change the trustee, "but not the right to revoke said gifts or trust estates hereby created."

(4) The right, in order to safeguard the several trust estates and for their better care, management and protection, and to meet changing or unexpected conditions, and for the benefit of the beneficiaries, to make such further changes in the declaration of trust as plaintiff should deem proper respecting the management of the trust estates, such as the character and form of investments to be made, the matter of changing investments or directing that any investment should remain and be held as a permanent investment after plaintiff's death, changing the trustee, and such other changes as in plaintiff's opinion would be for the best interest of the beneficiaries; all provided, however, that the right to make said changes should not operate to revoke the trusts, but should be exercised only as in plaintiff's judgment might be for the best interests of the beneficiaries.

(5) The right, during plaintiff's lifetime, after a beneficiary had reached the age of twenty-one years, to order and direct the trustee to make settlement either in full or in part with such beneficiary, or to pay such beneficiary a certain part of the net income from his or her trust estate.

(6) The right, at any time prior to plaintiff's death, to appoint one or more persons to act as advisors to the trustee.

(7) The right from time to time to pay or deliver to the trustee other and additional money or property for any beneficiary, which should become a part of the trust estate of such beneficiary, and should be invested, handled and managed as though the same had been a part of his original trust estate.

(i) The trust instrument provided that the trustee should not be liable for any loss to or diminution of the trust estates which might be sustained by the trustee's continuing to hold the investments authorized by the instrument, or by investing any of the trust funds in investments authorized by plaintiff.

(j) The trust instrument provided that the trusts should be irrevocable, and that plaintiff should not have the right to revoke the gifts therein made or the trust estates thereby created. The instrument was recorded in Pontotoc County, Oklahoma, on October 2, 1935.

The First National Bank of Ada accepted its appointment as trustee, and acted as such until September 10, 1927, when it became insolvent and went into liquidation, and The First National Bank in Ada was organized. Thereupon plaintiff executed a written instrument changing the trustee and appointing The First National Bank in Ada to the trusteeship. That bank continued to act as trustee until October 29, 1932, when plaintiff executed a written instrument changing the trustee and appointing C. L. Griffeth as trustee. Mr. Griffeth has continued as trustee since his appointment on October 29, 1932.

Plaintiff was a stockholder in and president of The First National Bank of Ada when he appointed it trustee on January 20, 1921. Within a year thereafter he sold entirely out of that bank and was never thereafter interested in it. He was a stockholder in and president of The First National Bank in Ada during all the time it acted as trustee. C. L. Griffeth was cashier of The First National Bank of Ada, and later became and is now auditor of and an officer in Choctaw Cotton Oil Company in which plaintiff was and is a stockholder.

The beneficiaries of said trusts were the children of plaintiffs, P. A. Norris and Josephine Norris, and their names and dates of their birth are as follows, to-wit: Marjorie E. Norris, born on January 2, 1907; Frank C. Norris, born on July 22, 1908; Phillip A. Norris, born on August 13, 1910; John C. Norris, born on September 23, 1913; Harry A. Norris, born on July 13, 1915; Tom R. Norris, born on December 21, 1916; Susan J. Norris, born on July 11, 1918.

The beneficiary Harry A. Norris died on December 24, 1933.

As to the two trusts, the income of which is involved only in Cause Number 58:

(a) On March 1, 1935, plaintiff P. A. Norris executed, acknowledged and delivered another instrument in writing entitled "Declaration of Trust", in which he appointed C. L. Griffeth as trustee, and in which he conveyed to said trustee certain real estate therein described for the sole and exclusive use and benefit of his daughter Ada Norris Berry, and certain other real estate therein described for the sole and exclusive use and benefit of his daughter Margaret Norris Hall. Plaintiff therein declared that each of said trusts should

468

be irrevocable and should continue for a period of twenty years from the date of the instrument. Contemporaneously with the execution and delivery of said trust instrument, plaintiff also executed and delivered to the trustee deeds of conveyance, conveying to him the said property described in said declaration of trust. This declaration of trust and the deeds of conveyance were recorded on July 22, 1935.

(b) The trust instrument required the trustee to keep, hold, manage and account for each of said trust estates separately from the other, and gave to the trustee the possession, management and control of each of said estates, with power whenever in his judgment it was to the best interest of the trusts, to sell said property and to invest and reinvest the whole or any part of the proceeds thereof and the income therefrom in well-located business property or in well-improved farm lands, or in loans secured by first mortgage liens upon desirable real estate, and in bonds of the United States or of any state or of any legally constituted municipality, and, during plaintiff's lifetime, in such other property as should be approved by plaintiff, all upon such terms and conditions as the trustee might deem for the best interest of the trust estates; and the instrument empowered the trustee, subject to its terms and provisions, to receive title to, hold, buy, sell, exchange, transfer and convey both real and personal property, and generally to do any lawful act in relation to said trust estates and the property belonging thereto which any individual owning the same might do.

(c) It was provided that the income from each trust estate should be added to and become a part of the corpus of the estate to which it accrued, and be invested and handled as such until the termination of the trusts, unless otherwise directed by plaintiff as thereinafter provided.

(d) It was provided that neither of the beneficiaries should have power during the trust period to revoke or annul any of the provisions of the trust instrument, or to exercise any authority or control over the management of the trust estates; nor should either assign, convey, mortgage or hypothecate her trust estate or the income therefrom, or create a lien or charge thereon prior to the time that the same should be paid over and delivered to her; nor should the trustee recognize any such assignment, charge or claim; but that all

corpus and income, when due under the terms of the instrument, should be by the trustee paid only to the beneficiary entitled thereto in person or to her children in the event of her death.

(e) It was provided that, if the trustee considered it proper to do so, he might make joint investments of the funds of both estates in any property, but that the interest of each trust estate in such property should be set up separately and credited to the estate to which it accrued.

(f) The instrument required annual reports of the condition of each estate. It provided that the trustee should pay and discharge any and all lawful taxes, and all reasonable and lawful expenses and charges incurred in the management and preservation of the estates.

(g) It was provided that upon the termination of the trusts at the end of twenty years the trustee should make full and complete settlement with each beneficiary, and deliver to each in person her trust estate, whether then in money, bonds, real estate or other property, and all increment thereto, and should execute and deliver to each beneficiary all such assignments and conveyances as might be necessary to vest in each her estate with its accumulations.

(h) It was provided that if either of the beneficiaries should die during the trust period, the trust should not thereby become terminated, but should continue for its full term; and that, upon its termination the trust estate should be paid to the child or children of such beneficiary, and that if there should be no child or children of a deceased beneficiary, then her trust estate should be paid to the beneficiary of the other trust or to her children; and that, if both beneficiaries should die leaving no child or children surviving them, then the trust estates should go to the heirs at law of the respective beneficiaries.

(i) It was provided that if either or both of the beneficiaries should die during the trust period and leave a minor child or children, and the trustee should find that the proper maintenance and education of such minor child or children required that the whole or a portion of the income of its or their trust estate should be currently expended for his, her or their maintenance or education, then the trustee should have power and it should be his duty to so expend the same.

(j) In the trust instrument plaintiff reserved to himself the following rights:

(1) The right to approve or disapprove, during his lifetime, investments of trust funds proposed to be made by the trustee in property of a character not mentioned in the trust instrument.

(2) The right, while plaintiff should live and continue capable of attending to his ordinary business affairs, to designate the investments which should be made of the trust funds.

(3) The right to change the trustee, but not the right "to revoke the gifts hereby made or the trust estates hereby created or to retake the same or any part thereof or the income therefrom."

(4) The right to direct the trustee to pay the whole or a part of the net income from either of said trust estates to the respective beneficiary thereof either currently or at irregular intervals provided, that upon plaintiff's death, the trustee was authorized to pay to each or either beneficiary so much of the annual income of her trust estate as in the trustee's judgment would be for the best interest of such beneficiary, not exceeding in any one year three-fourths of the net income of said estate.

(5) The right to appoint one or more persons to act as advisors to the trustee.

(6) The right from time to time to pay, assign, transfer, convey and deliver to the trustee other and additional money or property for the use and benefit of either or both of said beneficiaries, which should become a part of the corpus of the trust estates and be managed and controlled as if they had been a part of the original trust estates.

(k) The trust instrument provided that the trustee should not be liable for any loss to or diminution of either of said trust estates which might be sustained by his continuing to hold the investments therein authorized or by reason of investing or reinvesting any of the funds in investments approved by plaintiff during his lifetime, or in investments authorized by the trust instrument after plaintiff's death or incapacity.

(1) The instrument provided that "none of the rights herein reserved to me, however, shall operate to revoke either of the gifts hereby made or the trusts hereby created, but said gifts or trusts shall be irrevocable and unalterable."

C. L. Griffeth accepted his appointment as trustee of each of said trusts, and has acted as such ever since.

The beneficiaries of said trusts were daughters of plaintiff P. A. Norris by a former marriage, and their names and the dates of their birth are as follows, to-wit: Ada Norris Berry, born on June 30, 1893; and Margaret Norris Hall, born on August 25, 1895.

When, on March 1, 1935, plaintiff executed the declaration of trust in favor of Margaret Norris Hall and Ada Norris Berry, he filed a federal gift tax return, and paid to defendant H. C. Jones $4,200 as a gift tax on those gifts, and he subsequently paid thereon a deficiency assessment of $900, making a total gift tax of $5,100, which he paid on those gifts.

After the execution of the declaration of trust dated January 20, 1921, plaintiff made additional gifts to those trusts. On March 30, 1928, he gave them 3,150 shares of stock in Chickasha Cotton Oil Company, 450 shares to each trust. On May 1, 1929, he gave them 2,100 shares of stock in Chickasha Cotton Oil Company, 300 shares to each trust. On June 15, 1929, he gave them 600 shares of stock in The First National Bank of Ada, one-seventh to each trust. On June 15, 1929, he gave them 333 shares of stock in The First National Bank of Guthrie, one-seventh to each trust. Those gifts were made by transferring and delivering the certificates of stock to the trustee.

Plaintiff alleges, and has offered evidence in support thereof, that he did not execute the declaration of trust dated January 20, 1921, for the purpose of avoiding or minimizing his taxes, or for the purpose of deriving any personal benefit from the trust estates; that he was prompted solely by his love for his children, and his parental desire to safeguard their future welfare by creating separate estates for them and having said estates built up and increased by the addition of their incomes to the corpus over a period of twenty years, so that when the trusts terminated the beneficiaries would have reached mature ages and would have become competent to manage their affairs in a businesslike manner, and the estates then to be turned over to them would have become substantial in amount; that it was his intention to divest himself forever of all right, title and interest in the trust property and to vest the same in the beneficiaries forever; that it was not his in-

470

tention that any part of the income of the trust estates should be distributed to him or be accumulated for future distribution to him; and that no part of either the corpus or income of either of the trust estates has ever been distributed to plaintiff. He further alleges, and offers proof in support of his allegation, that no part of the corpus or income of either of those trusts should be used for the support, education or maintenance of any of the beneficiaries during their minority, and that no part thereof has been so used; that he has supported, educated and maintained his children out of his own resources and without recourse to the trust estates.

Plaintiff alleges, and offers proof in support of said allegation, that in executing the declaration dated March 1, 1935, creating the two trusts, his sole purpose was to make provision for the future welfare of his two daughters, who were about forty and forty-two years of age at the time, were married, and had children; that he desired to set over the property described therein, so that they would have the benefit of that property but no power to sell or manage the same until after the expiration of the trust period; that it was his intention to divest himself forever of all right, title and interest in that trust property and to vest the same in the beneficiaries forever; that it was not plaintiff's intention that any part of the corpus or income of those two trust estates should be distributed to him or be accumulated for future distribution to him; and that no part of either the corpus or income of either of those trust estates has ever been distributed to plaintiff.

Plaintiff further alleges that upon the creation of these trust estates books of account were set up for the trust, and they have been honestly, correctly and accurately kept from the beginning up to now. Those books of account have at all times correctly shown and do now show the corpus of each trust estate, every item of income of each estate, all sums due and owing them and from whom due, and all taxes and expenses paid out.

That from time to time, after the execution of the trust instrument dated January 20, 1921, plaintiff gave in some instances, and in others sold, to the trustee for the trust estates various tracts of land situated in Pontotoc, Coal and other neighboring counties, and he executed, acknowledged and delivered to the trustee deeds conveying said lands to the trustee in trust for said beneficiaries. Said deeds were not recorded until some time in the year 1935; but the property conveyed by them to each trust estate was immediately entered, listed and described upon the books of the trust estate to which it belonged as property of said estate and constituting a part of the corpus thereof; and all rents and profits accruing from said lands from and after the dates of said conveyances were entered upon the books of the trust estates to which said lands belonged as income accruing to said estates, and each trust estate received and had the full economic benefit of said income.

That in 1933 oil and gas were discovered in the vicinity of some of these lands in Pontotoc County, and opportunity arose to lease advantageously some of the lands for oil and gas. Thereupon, the trustee and plaintiff had a conference upon the question whether the declaration of trust and the various deeds executed by plaintiff to the trustee should be recorded and the trustee should execute the oil and gas leases on the lands, or whether plaintiff, who still appeared on the records of the County Clerk as the owner of the lands, should execute the leases for the use and benefit of the trusts. On the advice of counsel to the effect that, if the trust instrument was recorded, it would enter into the abstract of title to each tract of land and might raise questions in the minds of attorneys examining the abstract of title, and cause difficulty in selling leases thereon, it was concluded that the trust instrument and deeds should not be recorded at that time, but that plaintiff should execute the leases in his name but for the use and benefit of the trusts, and that the trust instrument and deeds should be recorded after the leasing was over. That was done. Plaintiff executed the leases to the various lessees; but the fact of the execution of each lease was immediately entered upon the books of the trusts, giving the date of the lease, the name of the lessee, the description of the land leased, and the bonus paid therefor. Plaintiff did not convert to his use any of the bonuses or royalties payable for or under said leases, but the whole thereof went to the use and benefit of the beneficiaries under said trusts. In 1935, after the period of leasing was over, the declaration of trust and the deeds that had been executed by plaintiff to the trustee were recorded, and the trustee confirmed

to the lessees the leases which had been executed to them by plaintiff.

That from the beginning until some time in 1935, all funds accruing to the trust estates were deposited in plaintiff's bank account and remained there until they were invested. However, plaintiff did not receive those deposits into his bank account as funds belonging to him; but in every instance he entered upon his books the fact of each deposit and the amount thereof, from what source it accrued, and to which estate it belonged, and he credited the proper trust estate therewith. At the same time the trustee always entered on the books of the trust estate to which the deposit belonged the fact of the deposit, the amount thereof and the source from which it accrued, and charged plaintiff therewith. At no time did plaintiff assert any right or title to those funds adverse to the trusts and plaintiff always fully accounted to the trusts for those deposits. Plaintiff considered himself, and he was, a mere agent, custodian or conduit through which those funds passed to the trusts. He did not claim to be the owner of those funds, and he did not convert them to his own use. The full economic benefit of all funds belonging to the trusts was received and had by the trusts themselves. All deposits of trust funds in plaintiff's bank account were made with the consent of the trustee, who had full knowledge at all times of everything that was done, and a record of the amount and source of all funds so deposited.

That the trustee filed federal income tax returns and paid the taxes for the trusts each year when they had taxable income. Those returns were checked from time to time by agents of the Internal Revenue Department, who examined both the trust books and plaintiff's books, and who knew that the trust funds were deposited in plaintiff's bank account and stated that fact in their reports. From the beginning until 1934 those returns were accepted by the Internal Revenue Department as properly made by the trustee and the income of the trust estates as properly taxable to the trusts. Prior to 1934 the only question that the Internal Revenue Department raised was whether the declaration of trust created seven separate trust estates or only one trust estate for the joint use and benefit of the seven beneficiaries; and the department ruled that it created seven separate trusts. And it was only after the income of the trusts from oil and gas leases had become quite large in 1934 and 1935 that the Internal Revenue Department asserted that the trust income was taxable to plaintiff.

That from the beginning until 1929 the amount in plaintiff's bank account was always greatly in excess of the trust funds on deposit therein. There were times from the beginning of 1929 to the end of 1933 when the amount in plaintiff's bank account was less than the trust funds deposited therein; but strict account of the trust funds was kept, the accounts were balanced from time to time, and the trusts received everything belonging to them. During the year 1936 the amount in plaintiff's bank account exceeded the amount of the trust funds deposited therein. Since 1936 each trust estate has maintained its own bank account, and no trust funds have been deposited in plaintiff's bank account except small items of rentals deposited in outlying banks and immediately cleared to the bank accounts of the respective trusts.

That as to the year 1934: In the latter part of 1933, because of the oil and gas developments in the vicinity of the lands belonging to the trusts, it became reasonably apparent that the trusts would have large incomes from oil lease bonuses and royalties, seven leases having been executed in behalf of the trusts in the latter part of 1933; and the trustee and plaintiff and certain of the adult beneficiaries had frequent conferences and discussions respecting the investment of the trust incomes. Plaintiff owned stock in a number of prosperous cotton oil companies, among them Sulphur Springs Cotton Oil Company, Honey Grove Cotton Oil Company, and Mount Pleasant Cotton Oil Company. The trustee, who was himself secretary and treasurer of Choctaw Cotton Oil Company, was familiar with all those companies. He audited their books each year, prepared their income tax returns for them, and he knew of their earning power. He therefore told plaintiff that he would like to acquire for the trusts a block of stock in Sulphur Springs Cotton Oil Company; and, in December, 1933, it was orally agreed between plaintiff and the trustee, with the knowledge and approval of certain of the adult beneficiaries, that plaintiff would sell to the trustee and the trustee would buy for the trusts 990 shares of the capital stock of Sulphur Springs Cotton Oil Company and certain real estate at the original cost thereof to plaintiff, namely, $142,919.70; that the trustee

should make payments on the purchase price as income accrued to the trusts; and that, when the purchase price had been paid, plaintiff should transfer the stock and convey the property. That arrangement was carried out on each side. As trust income accrued it was paid to plaintiff on the purchase price of the stock and real estate, and, when the purchase price had been paid, plaintiff transferred and conveyed to the trustee the stock and real estate. While the actual transfer of the stock and the conveyance of the real estate was not made until the end of the year, when the purchase price had been fully paid, nevertheless the transaction was treated by plaintiff and the trustee as consummated in the beginning of the year 1934, and the trusts received all income that accrued from the stock and real estate during the year 1934 as though they had been the owners thereof on January 1st of that year. Although plaintiff could have sold the stock to third persons for at least as much as $150 per share, he sold it to the trustee at $100 per share, which was par, and was what it had cost plaintiff. The trusts still own that stock, and in the five years that have elapsed since they acquired it Sulphur Springs Cotton Oil Company has paid to the trusts 55 per cent in cash dividends, and in addition it has had earnings which have not been distributed.

That as to the year 1935: The Sulphur Springs Cotton Oil Company stock and the real estate having been acquired and having been paid for by the end of the year 1934, and the trust income having become large, in the early part of 1935 plaintiff and the trustee, with the knowledge and approval of certain of the adult beneficiaries, made a similar agreement for the purchase by the trustee from plaintiff of stock in Honey Grove Cotton Oil Company and Mount Pleasant Cotton Oil Company, to be paid for out of trust income as it accrued, and the stock to be transferred to the trustee when fully paid for. The agreement was that plaintiff would sell to the trustee 490 shares of preferred stock in Honey Grove at par, namely, $100 per share, with 980 shares of common stock thrown in, that is, the common stock was also to go to the trusts but nothing was to be paid for it; and also that plaintiff should sell to the trustee 504 shares of stock in Mount Pleasant Cotton Oil Company at $150 per share. Those prices were the original cost of the stock to plaintiff. It was agreed that payment for the stock

should be made to plaintiff out of the income of the trusts as it accrued until the stock was paid for, when plaintiff should assign the stock to the trustee. That agreement was carried out. Full payment having been made for the stock, plaintiff transferred the same, to-wit, 490 shares of Honey Grove preferred, and 980 shares of Honey Grove common, and 504 shares of Mount Pleasant to the trustee in July, 1935. At the time of said sale all of the stock was worth more than the trustee paid for it. The trusts still own all of that stock, and since its acquisition Honey Grove has paid them 30 per cent in cash dividends, and Mount Pleasant has paid them 120 per cent in cash dividends.

That the stock in Honey Grove which the trusts purchased from plaintiff was formally assigned to the trustee on July 17, 1935, and the trusts have owned the same ever since. That constituted 98 per cent of the outstanding stock in Honey Grove. Plaintiff owned the other 2 per cent. In August, 1935, after the trusts had acquired the stock, plaintiff and the trustee as stockholders determined that a voluntary assessment in the sum of $75,000 should be made upon the stockholders of Honey Grove for the purpose of buying additional gins and other properties and expanding the business of that company; and that assessment was made. In payment of that assessment plaintiff, with the knowledge and approval of the trustee, delivered to Honey Grove Cotton Oil Company a check on plaintiff's bank account in favor of Honey Grove for the sum of $75,000. As the trusts then owned 98 per cent of the stock in Honey Grove, it resulted that 98 per cent of that $75,000, to-wit, $73,500, was put into Honey Grove for and in behalf of the trusts, so that $73,500 of that $75,000 thus drawn out of plaintiff's bank account was not drawn out for plaintiff but for the trusts; and in so paying out the same plaintiff was not chargeable with using the trust funds for his own benefit.

That also, after the trusts had acquired the stock in Honey Grove, money was advanced to Honey Grove out of plaintiff's bank account for operating purposes, so that on September 30 Honey Grove owed its stockholders $25,509.24. On October 31 it owed them $33,665.86, and on December 31 it owed them $39,300.76. All of this was repaid. This money was advanced to Honey Grove out of plaintiff's bank account

with the knowledge, concurrence and approval of the trustee; and 98 per cent of the money so advanced was advanced for and in behalf of the trust estates; and in advancing the same plaintiff was not using the trust funds for his personal benefit.

It is plaintiffs' contention that, under the uncontradicted evidence the deposit of the trust funds in the bank account of P. A. Norris, and the withdrawal of said trust funds for the benefit of the trust estates were in good faith, and that there was not a day during the years 1934 and 1935 and any year thereafter when the amount in plaintiff's bank account did not exceed the total of the funds lawfully belonging to the trusts; that the trusts have received the full economic benefit of the corpus and all the income of the trust estates; that plaintiff has not utilized the trust estates for his own personal benefit but that his sole purpose has been to see that the trust estates were properly managed and conserved; and, that he has always faithfully and honestly accounted to the trusts for all trust funds which came into his hands.

The defendant contends

(1) That the declarations of trust involved in these cases were never recorded until October, 1935 and that no revenue stamps were attached to said instruments, and, therefore, the trust property standing in the name of the trustor was subject to the claims of his creditors, and that the handling of the trust estates in the manner aforesaid was not in keeping with the ordinary management of bona fide trusts.

(2) That the trustor reserved the right in the trust instruments (a) to replace the trustee; (b) to control all investments made by the trustee; (c) to change the trusts in any respect; and, (d) to provide that the trustee shall not be accountable for losses sustained in investing under the supervision of the trustor.

(3) That where grantor of purported trusts reserves and exercises complete control over the management and disposition of the trust property and the income therefrom, and actually receives all the income from said trust property and expends the same for his own use and benefit, but credits the so-called trusts on his books of account with the amounts so received, the income of the trusts is taxable to him.

The court has set out at great length the facts in this case as disclosed by the stipulation and the uncontradicted testimony of the plaintiffs. This statement of facts is also supported by the defendant's principal witness, C. L. Griffeth, the trustee under all the trusts.

The collection of this tax by the defendant is based upon his construction of Sections 166 and 167 of the Revenue Act of 1934, 48 Stat. 729, Title 26 U.S.C.A. § 166 and § 167, which provide:

"Sec. [§] 166. Revocable trusts

"Where at any time the power to revest in the grantor title to any part of the corpus of the trust is vested—

"(1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or

"(2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,
then the income of such part of the trust shall be included in computing the net income of the grantor."

"Sec. [§] 167. Income for benefit of grantor

"(a) Where any part of the income of a trust—

"(1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, held or accumulated for future distribution to the grantor; or

"(2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or

*   *   *   *   *   *

then such part of the income of the trust shall be included in computing the net income of the grantor."

The questions raised by the defendant involve a construction of the declarations of trust themselves. The meaning of a declaration of trust must be determined by the provisions of the instrument itself. If there be any ambiguity or lack of clearness in the express provisions of the declaration, then resort may be had to extraneous circumstances to determine the exact intention of the trustor, and the meaning of the instrument. When, however, there is no ambiguity, and the language of the declaration of trust is clear and is susceptible of one construction only, the plain provisions of the trust instrument

must determine its construction. Commissioner of Internal Revenue v. Yeiser, 6 Cir., 75 F.2d 956, and Commissioner of Internal Revenue v. McIlvaine, 7 Cir., 78 F.2d 787, 102 A.L.R. 252.

The first proposition, with reference to the failure to record the declarations of trust or to place revenue stamps thereon, is determined by the laws of Oklahoma. Whether these declarations of trust, though unrecorded, constituted legal trusts, vesting the trust estates in the beneficiaries named, has been heretofore determined by the Supreme Court of Oklahoma in Kimberly v. Cissna, 161 Okl. 17, 16 P.2d 1090, in which the court said, quoting from the first syllabus: "A trust relation in real estate may be created by virtue of section 8465 (O.S.1931, sec. 11820, 60 Okl.St.Ann. § 171) and also by the first subdivision of section 8462, C.O.S.1921 (O.S.1931, sec. 11808, 60 Okl.St.Ann. § 136, subd. 1); and as between the parties it is not essential to the validity of such trust that the instrument creating it be acknowledged and recorded as provided by section 8466, C.O.S.1921, 60 Okl.St.Ann. § 172."

This court in Hudson v. Jones, D.C., 22 F.Supp. 938, passed upon this question and held that the failure to record the declarations of trust did not affect their validity as between the parties, and the Sixth Circuit Court of Appeals in Rose v. Commissioner of Internal Revenue, 65 F.2d 616, 617, said: "That the instrument was not recorded is of no importance. As a conveyance it was good as between the parties, and there is no question here of the rights of third persons without notice."

In Hudson v. Jones, supra, this court also held that the collector of internal revenue could not be considered as a third person without notice.

The second proposition involves the right of the trustor to replace the trustee. This question has been passed upon by the Supreme Court of the United States in Reinecke, Collector of Internal Revenue, v. Northern Trust Company, 278 U.S. 339, 344, 49 S.Ct. 123, 124, 73 L.Ed. 410, 66 A.L.R. 397, in which the court said: "The settlor reserved to himself power to supervise the reinvestment of trust funds, to require the trustee to execute proxies, to his nominee, to vote any shares of stock held by the trustee, to control all leases executed by the trustee, and to appoint successor trustees."

And the court held that such reservation did not make the grantor taxable.

Section 11822, O.S.1931, Title 60 Okl.St.Ann. § 173, provides: "Instruments creating express trusts may provide for succession to any trustee, in case of the death, resignation, removal, or incapacity of such trustee. In case of any such succession, the title to the trust property shall at once vest in the succeeding trustee."

Under the same proposition, the reservation in the declarations of trust is that the trustor could control all investments made by the trustee. In Reinecke v. Northern Trust Co., supra, the court said, 278 U.S. at page 346, 49 S.Ct. at page 125, 73 L.Ed. 410, 66 A.L.R. 397: "Nor did the reserved powers of management of the trusts save to decedent any control over the economic benefits or the enjoyment of the property. He would equally have reserved all these powers and others had he made himself the trustee, but the transfer would not for that reason have been incomplete. The shifting of the economic interest in the trust property which was the subject of the tax was thus complete as soon as the trust was made. His power to recall the property and of control over it for his own benefit then ceased and as the trusts were not made in contemplation of death, the reserved powers do not serve to distinguish them from any other gift inter vivos not subject to the tax."

In Commissioner of Internal Revenue v. Waterbury, 2 Cir., 97 F.2d 383, 386, the court, after reciting the provisions of the trust, said: "Reserve powers of management do not invest the grantor with any control over the economic benefits or enjoyment of the trust property and this paragraph would not make applicable section 167. Compare: Reinecke v. Northern Trust Co., 278 U.S. 339, 346, 49 S.Ct. 123, 125, 73 L.Ed. 410, 66 A.L.R. 397."

The same construction is supported by Commissioner of Internal Revenue v. Bacher, 6 Cir., 102 F.2d 500, and Canfield v. Commissioner, 31 B.T.A. 724.

In Bliss v. Commissioner, 26 B.T.A. 962, 966, the Board of Tax Appeals said: "Nor do we think it of any importance that the grantor would have to be consulted in connection with certain discretionary powers as to investments and exchanges or sales of securities. The fact that he should be consulted does not mean that he had any power to prevent the trustee from exercising its best judgment, and, in any event,

it does not indicate that the grantor had any power of revocation or alteration, or to obtain or secure any of the income for himself."

The defendant also contends that the reservations in the declarations of trust of the power of the trustor to change the trusts in any respect would make the trustor liable to the tax. With all due respect to counsel for the defendant, the court does not find any such reservation in the trusts.

Section 8 of the declaration of trust provides:

"In order to safeguard the several trust estates and for their better care, management, and protection, and to meet changing or unexpected conditions brought about by time and experience, and for the benefit of my said beneficiaries, I do further reserve the right at any time prior to my death, and from time to time as I may deem proper, to make such further changes in this declaration of trust as I may see fit and proper to make in the management thereof; and in the character and form of investments; in changing investments, or in directing that any investment shall remain and be held as a permanent investment after my death; in changing the trustee, or such other changes as may in my opinion be for the best interest of my said beneficiaries. * * *

"The right to make the changes in said declaration of trust, herein set out, shall not, however, operate to revoke the several trust estates hereby created, but is intended to be exercised only as in my judgment may be for the best interest of said beneficiaries."

The trust estate consists of the original corpus conveyed by gift or deed to the trustee and the income therefrom. Section 5 of the declaration of trust provides: "The net income from each of said trust estates, as it accrues, shall be, during the term of this trust, retained by my said Trustee, and shall be added to and become a part of said trust estates, to be invested and handled as hereinbefore set out, until the full termination of this trust, unless otherwise directed by me, as hereinafter provided."

Section 4 provides: "This trust is created for, and is intended as an irrevocable gift to seven of my children, * * *."

The defendant contends that the use of the expression in section 8 of the declaration of trust, "or such other changes as may in my opinion be for the best in-

terest of my said beneficiaries", gives the trustor the power to use the income from these estates for his own use. The following paragraph, however, modifies, explains and clarifies the questionable expression: "The right to make the changes in said declaration of trust shall not, however, operate to revoke the several estates" and these trust estates consist of the corpus and the income therefrom.

Under the rule of ejusdem generis, as recognized in Oklahoma, "such other changes" must refer to similar changes provided in the trust. This rule is clearly announced in Smith v. First National Bank, 114 Okl. 293, 245 P. 653, and has been followed generally by the federal courts.

There certainly is no reservation in this trust to revoke the trust or to change beneficiaries and the only reservations that are made are to exercise a supervisory direction as to the investment of the income from the trust estate and the investment of the proceeds from the sale of trust estate property. There is not an intimation anywhere in the declarations of trust that the trustor may receive any portion of the trust estate or any income therefrom. There is not an intimation that the trustor shall have power to change the trust so as to provide for disposition to him of any portion of said estate or income therefrom but throughout the declarations of trust and the amendments thereto there is always present the provision that this trust is irrevocable.

Under the second proposition, also, the defendant contends that the declaration of trust is defective in that it provides that the trustee shall not be accountable for losses sustained in investing under the supervision of the grantor.

In the Restatement of the Law of Trusts by the American Law Institute, Section 185, it is said: "Where by the terms of the trust it is provided that in the administration of the trust the trustee shall do certain acts if he is directed by another person to do them, it is ordinarily his duty to comply with such directions and he is ordinarily liable if he fails to do so. So also, where by the terms of the trust it is provided that the trustee shall not do certain acts without the direction or consent of another, it is ordinarily his duty not to do such acts without such direction or consent. Thus, if it is provided by the terms of the trust that the trustee shall invest in such secu-

rities as the settlor or a third person shall direct, or shall sell such securities as he shall direct, or that the trustee shall not invest in any securities without his approval, or shall not sell securities without his consent, the trustee is ordinarily under a duty to comply with these provisions, and is not liable if he complies, but is liable for a loss resulting from his failure to comply."

There is little merit to this contention of the defendant. There might be losses in a trust estate, and often are, but the liability of the trustee must be determined by his good faith and his conduct in carrying out the plain provisions of the trust agreement.

The third proposition raised by the defendant is not supported either by the facts or the law.

In my judgment these declarations of trust are clear and unambiguous and it is necessary only to resort to the instruments themselves to determine just what the instruments mean.

The sole question for determination is whether or not the trustor, P. A. Norris, under the terms and provisions of these declarations of trust, could receive, either from the corpus of the estate or the income therefrom, any portion thereof for himself, or whether there could be accumulated in said estate income to be distributed to the trustor at any future time.

Section 166 of the Revenue Act of 1934, supra, provides that the trustor in a trust agreement shall be liable for tax where at any time he had the power to revest in himself title to any part of the trust or the income therefrom.

Section 167 makes the trustor liable where the distribution of any portion of the estate, either the corpus or the income, may in his discretion be made to the grantor or accumulated for future distribution to him.

But there is nothing in these trust instruments that would make the trustor liable either under section 166 or section 167, supra.

It is admitted by the defendant that the trustee's books were kept accurately and that they disclose all property acquired by the trust estates and the income therefrom, and there is no contention that the books of the plaintiff, P. A. Norris, are not accurate in every particular.

Prior to 1933 there was very little income accumulated on behalf of the trust estates. The trustor had given to the estates certain corporate stocks and many tracts of farm property. The only income from the farm properties was rentals. The farms were scattered over various parts of the state. The rents were deposited by the tenants in the local banks to the credit of P. A. Norris and the trustee was immediately advised of such deposits and he immediately entered upon his books the collection of these small amounts and handled it as an ordinarily prudent man would handle a transaction. There was never a time from the inception of the trust estates down to 1935, a period of approximately fourteen years, when it was not easy to determine the exact amount of property belonging to each of the trusts and the exact amount of income to be properly credited to each trust, and up until October 1935 these farm lands were held in the name of P. A. Norris but there is no contention, (and if there were such a contention, there certainly is no evidence to support it) that it was not thoroughly understood between P. A. Norris and the trustee that these lands belonged to the trust estates.

In the latter part of 1933 a very promising oil development in the immediate vicinity of the lands belonging to the trust estates made it necessary to consider the class and type of investments that would be made from the probable income from these trust estates. The trustee was a practical cotton oil man. The handling of cotton seed and cotton seed products is one of the most valuable departments in the cotton marketing industry and has always been a very lucrative business in Oklahoma. The uncontradicted evidence discloses that the trustee wanted to purchase some of the stock in the various cotton oil mills that were largely owned by the plaintiff, and an agreement was reached whereby the plaintiff, P. A. Norris, would sell to the trustee certain stocks in these various cotton oil companies to be paid for out of the income from these trust estates as accumulated.

It was furthermore discussed between Norris, the trustee, and the attorney for Norris, that it would be much simpler and easier for Norris to execute oil leases on these trust lands and then the declarations of trust would not be required in the abstracts of title. This would mean quite a saving to the estates. It was not impractical. It was not illegal. In fact, it was thoroughly practical in view of the great

expenses which would be incurred in the preparation of abstracts to these various properties.

From time to time, during the year 1934, payments were made on the stocks purchased by the trustee from Norris, from the income accumulated in the trust estates, and the same procedure was followed in 1935. By October 1935 the stocks were all paid for and were properly assigned to the trustee, and, also, the deeds to the trust real estate were filed for record and a confirmation was made by the trustee of the leases which had theretofore been executed.

There is no evidence in this record that P. A. Norris ever received any sum for himself either from the trust estates or from the income therefrom. Neither is there any evidence that he intended so to do but all the evidence shows that it was his desire and purpose to build up trust estates for his children so that they would be protected not only in their ownership but in the enjoyment of their respective estates, and that the various trust estates would remain in trust a sufficient length of time to enable his children to reach that age in life where they would possess sufficient business judgment to protect their own estates. There is nothing unreasonable in this. It is something that should be done by parents who own large estates and who have large families. Doubtless P. A. Norris, a man of wide experience and of good business judgment, had observed the dissipation of other estates where no protective restraint had been exercised on property inherited by children in similar circumstances.

The unusually large income to these trust estates during the years 1934 and 1935 suggested the advisability of maintaining separate accounts for each of the trusts and after a conference by P. A. Norris and his trustee with their attorneys, they were advised by the attorneys not only to record the declarations of trust and all conveyances and transfers of property but, thereafter to maintain separate accounts for each of the beneficiaries under the trusts, and that has been done down to the present time without any overhead expense to the trust estates.

In January 1921 the original corpus of the combined trust estates was $172,949. On December 1, 1938, the corpus of the nine trust estates was $1,963,197.47, which would indicate good management and careful handling of the estates.

These individual trusts had been recognized by the Commissioner of Internal Revenue as legal trusts for more than fifteen years, when the assessments involved in these cases were made. It is apparent that a much greater tax could have been collected by the defendant if the income from all of these estates could have been treated as income from one estate, but certainly this is no reason for the contentions of the defendant. The only question in which the defendant is concerned is who owned this property during the years 1934 and 1935. If in good faith Norris placed the property in the trust estates for the benefit of the named beneficiaries, his purpose in so doing is not open to question. The government has the power to tax income but the tax must be assessed against the legal owner.

It is admitted that the expression, "the power to tax is the power to destroy," recently has been challenged as a judicial precedent but the fundamental truthfulness of the expression has not been disturbed in the least.

One of the principal contentions of the defendant is that these various properties were held in the name of P. A. Norris until 1935, and that the income therefrom up until that time was deposited in P. A. Norris' bank account. This, however, has been fully explained by the plaintiff's evidence, none of which has been contradicted, and mere suspicion as to a state of facts is no substitute for uncontradicted evidence.

It is the judgment of this court, therefore, that the declarations of trust are clear, unambiguous and legal; that they created nine separate and distinct trusts; that these trusts have been honestly administered; and that the income from these trust estates for the years in question was income from the individual estates of the named beneficiaries and was not the income of P. A. Norris.

Judgment will be rendered for the plaintiff in each case as prayed. The findings of fact and conclusions of law requested by plaintiffs are hereby approved as the findings and conclusions of this court. The findings of fact and conclusions of law requested by the defendant are disapproved. Exceptions are allowed the defendant. A form of judgment consistent with this opinion may be submitted within ten days from this date.